# LICENSE AGREEMENT

This License Agreement ("Agreement") is made and entered into effective ____1, 20__ ("Effective Date"), by and between Roger P. Jackson, M.D., 4706 West 86th Street, Prairie Village, Kansas 66207, U.S.A. ("Jackson") and ChoiceSpine, 400 Erin Drive, Knoxville, TN 37919 ("Licensee").

WHEREAS Jackson owns or is an exclusive licensee with the sole right to enforce certain patents relating to Intellectual Property Rights protecting Enabling Device Technologies for use in products, instruments and methods utilized in surgically implanting spinal fixation systems and patents that may issue from related applications claiming priority from the applications for those patents, including continuations and divisionals thereof, and all foreign derivatives thereto, hereinafter referred to as Jackson Patents, as hereinafter defined; and

WHEREAS Licensee desires to obtain a license from Jackson to the Jackson Patents to make, use, offer to sell, sell, or import into the United States, Products and Instruments pursuant to the terms set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual promises herein made and the mutual benefits to be derived from this Agreement, Jackson and Licensee covenant and agree as follows:

## Article I.

## DEFINITIONS

1.01    **Affiliate.** "Affiliate(s)" of a person or entity shall mean any corporation or other business entity, which during the term of this Agreement controls, is controlled by, or is under common control with a person or entity, but only for so long as such entity controls, is controlled by, or is under common control with such person or entity.  For purposes of this definition, "control" shall mean the possession of the power to direct or cause the direction of the management and the policies of an entity whether through ownership, directly or indirectly, of at least fifty percent (50%) of the outstanding, voting shares entitled to vote, and for non-stock organizations, the right to receive fifty percent (50%) or more of the profits by contract or otherwise, or in

1

countries where control of fifty percent (50%) or more of such rights is not permitted in the country where such entity exists, the maximum permitted in such country of the Territories (hereinafter defined).

1.02 **Affiliate Inventory.** "Affiliate Inventory" shall mean the Products (hereinafter defined), Instruments (hereinafter defined), and Related System Components (hereinafter defined) that have been sold or transferred to an Affiliate by Licensee or by another Affiliate and have not yet been sold, transferred, or scrapped.

1.03 **Confidential Information.** "Confidential Information" shall mean any data or information, oral or written, including, without limitation, technology, know-how, trade secrets, formula, algorithms, designs, data, compilations, calculations, methods, processes, ideas, invention, whether patentable or not, schematics, codes and other technical, business, financial and customer information that relates to either party's past, present, or future products, research, developments or business activities. Confidential Information shall also include the terms of this Agreement, and is further subject to Article X, Section 10.02 hereof. Notwithstanding the foregoing, Confidential Information shall not be deemed to include information that (1) is publicly available or in the public domain at the time disclosed; (2) is or becomes publicly available or enters the public domain through no fault of the party receiving such information; (3) is rightfully communicated to the recipient by persons not bound by confidentiality obligations with respect thereto: (4) is verifiably already in the recipient's possession free of any confidentiality obligations with respect thereto at the time of disclosure; (5) is independently developed and documented by the recipient; or (6) is approved for release or disclosure by the disclosing party without restriction.

1.04 **Enabling Device Technologies. "**Enabling Device Technologies" shall mean the technology and methods thereof licensed by Jackson to Licensee under the Jackson Patents as referenced in **TABLE A** and Schedule 1 through Schedule 11 thereto.

1.05 **Gross Sales.** Excepting sale or transfer to an Affiliate, "Gross Sales" shall mean the amounts of revenues and items or services of financial value received by Licensee, minus returns (i) for the transfer of title of any quantity of Products and/or Related System Components and (ii) for lease payments, rental, user fees, accommodation fees, surgical support fees, non-penalty loaner fees, consignment charges, or other income or revenue received with respect to

2

providing access to the Products and the Instruments for use with the Products. Nominal penalties charged sales agents for late return or failure to return loaner products and instruments shall not be included in revenue for Gross Sales. Where a Licensee sells or transfers Products or Related System Components to any Affiliate for sale, or Instruments for use, Gross Sales shall mean sales of the Affiliate of Products, Instruments, or Related System Components to an Unrelated Third Party, or lease payments, rental, user fees, accommodation fees, surgical support fees, non-penalty loaner fees, consignment charges, or other income received by the Affiliate with respect to providing Instruments, reduced as permitted herein, as well as Products, Instruments, and Related System Components sold or transferred to an Affiliate but that are no longer in Affiliate Inventory, unless there is record that such Products, Instruments, or Related System Components were scrapped or returned. Any inventory shortages found in any audit and unaccounted for will, in the case of such inventory shortage of Licensee, be assign a sale price equal to the highest listed sale price of the Licensee at the time the subject Products, Instruments, or Related System Components were available to be sold, and, in the case of a sale or transfer to an Affiliate, a sale price equal to the listed sale price of the Affiliate or Licensee, whichever is greater, at the time the inventory was sold to the Affiliate. Where a Licensee sells or transfers Products, Instruments, or Related System Components to any distributor, or to any non-affiliate to gain access to an overseas market, Gross Sales shall mean sales of the distributor or such non-affiliate to a non-wholesaler end user, such as a hospital system, and will be assign a sale price equal to the listed sale price of the Licensee or of such distributor or non-affiliate, whichever is greater, at the time the Products, Instruments, or Related System Components were sold or transferred. No deduction shall be permitted for any taxes, transportation costs/freight, incidentals, sales commissions or royalties paid to others by Licensee. Products shall be considered "sold" when billed out or invoiced.

1.06 **Improvements.** "Improvements" shall mean any and all modifications, additions, improvements, alterations, developments or refinements in or to the licensed Enabling Device Technologies referenced in **TABLE A** under Schedules 1-11 thereto and claimed in the Jackson Patents, or the manufacturing processes therefore, whether patented or unpatented, that may be made, developed, required or acquired by or for Jackson or Licensee during the term of this Agreement, wherein Licensee has the Intellectual Property Rights (hereinafter defined) needed to practice the licensed Enabling Device Technologies in current and future products.

3

1.07     **Instruments.** "Instruments" shall mean the instruments or tools covered by any of the Jackson Patents, including, without limitation, used to surgically implant and/or affix the Products or Related System Components. Notwithstanding the foregoing, Instruments explicitly exclude: (a) instruments or tools for intra-operative patient positioning and imaging technologies; (b) interbody spacers; and (c) certain limited Enabling Device Technologies subject to an exclusive license to other Jackson licensees or assigned to others, as shown in **TABLE D**.

1.08     **Intellectual Property Rights.**  "Intellectual Property Rights" shall mean all worldwide intangible legal rights and interests evidenced by or embodied in (a) any idea, design, concept, method, process, technique, apparatus, invention, discovery, or improvement, including any patent rights, trade secrets and know-how; (b) any work of authorship, including any copyrights, moral rights or neighboring rights; (c) any trademark, service mark, trade dress, trade name, or other indicia of source of origin; (d) and any other similar right.

1.09     **Jackson Patents.**  "Jackson Patents" shall mean only the United States patents licensed by Jackson to Licensee, as set forth in **TABLE A,** and covering Enabling Device Technologies under Schedules 1-11 thereto, to this Agreement, including patents claiming priority thereto, including any continuations, patent applications, substitutions, amendments, extensions, reexaminations, divisionals, renewals, confirmations, revalidations, reissues, and foreign counterparts thereto.

1.10     **Other Related IP In The Jackson Patent Portfolio.**  "Other Related IP In The Jackson Patent Portfolio" shall mean all other intellectual property of Jackson, including currently issued patents and any continuations, patent applications, substitutions, amendments, extensions, reexaminations, divisionals, reissues, additions and foreign counterparts thereto, not otherwise identified in this Agreement, and which explicitly excludes Jackson's Intellectual Property Rights for: (a) intra-operative patient positioning and imaging technologies; (b) interbody spacers; and (c) certain limited Enabling Device Technologies subject to an exclusive license to other Jackson licensees or assigned to others, as shown in **TABLE D**.

1.11     **Products.**  "Products" shall mean devices and methods of use covered by any of the claims in the Jackson Patents, including as set forth in **TABLE A** under Schedules 1-11 and as may from time to time be listed in **TABLE C**.  For purposes of the calculation and payment of

4

royalties under this Agreement, Products shall also include Instruments and Related System Components.

1.12 **Related System Components.** "Related System Components" shall mean the closure tops, receivers, shanks, retainers, rod-engaging inserts, lateral rod connectors, hooks, and certain rods sold separately or assembled with the related spinal fixation system or systems by or on behalf of Licensee or its Affiliates for use with and/or incorporated into the Products whether or not such components are themselves covered by any of the Jackson Patents.

1.13 **Territories.** "Territories" shall mean all countries of the world.

1.14 **Unrelated Third Party.** "Unrelated Third Party" shall mean, for the calculation of Gross Sales, a person, entity, non-affiliate, non-distributor and/or non-wholesaler, such as a hospital system or end user, that purchases the Products, Instruments and/or Related System Components, and wherein sales must be tracked to the final purchasing entity and reported per Article IV, Section 4.03 herein.

1.15 **Valid Patent Claim(s).** "Valid Patent Claim(s)" shall mean any claim of an issued and unexpired patent or an allowed pending patent application that has not been abandoned, or went unintentionally abandoned and appropriately revived, revoked or held unenforceable, invalid or unpatentable by a court or other government body of competent jurisdiction with no further possibility of appeal and which claim has not been disclaimed, denied or admitted to be invalid or unenforceable through reissue, re-examination or disclaimer or otherwise. All claims of the Jackson Patents, including those covering the licensed Enabling Device Technologies and methods, shall be treated by Licensee as valid until determined to be invalid by a court of competent jurisdiction, and all royalties to be paid hereunder shall be timely paid per this Agreement to Jackson and not held in escrow until such time as invalidity may be established, and wherein paid royalties up and until that time shall not be refundable.

5

**Article II.**

**<u>OWNERSHIP</u>**

2.01    **Intellectual Property Rights.**  As between Jackson and Licensee, Jackson shall be deemed to be the sole owner of all Intellectual Property Rights in and relating to the Jackson Patents and the Enabling Device Technologies, including all designs, drawings, processes, procedures and any and all other information claimed or disclosed therein.  Notwithstanding the foregoing, Jackson shall not be deemed to be the owner of any rights in the trademarks selected by Licensee in connection with the Products made, used, offered for sale, sold or distributed by or on behalf of Licensee or its Affiliates.

**Article III.**

**<u>GRANT OF LICENSE</u>**

3.01    **Grant Of License.**  Upon the Effective Date, Jackson hereby grants to Licensee, and its Affiliates, a non-exclusive, non-transferable license under the Jackson Patents in the Territories to make, use, offer to sell, sell, or import into the United States, Products and Instruments.  Licensee shall not have the right to sublicense its rights under the Jackson Patents to non-affiliated third parties. Notwithstanding the foregoing, Licensee shall be entitled to grant sublicenses to an entity that has been granted the right by Licensee to distribute or resell Products or Instruments, provided that such sublicense shall only apply with respect to such distribution or resale, and that royalties are based on sales to Unrelated Third Parties, defined as end users, and not to other distributors or purchasing entities.  Notwithstanding the license granted herein, Jackson retains for himself all rights to the Jackson Patents and the Enabling Device Technologies.

3.02    **Other Related IP In The Jackson Patent Portfolio.**  Upon the Effective Date, Jackson hereby grants to Licensee and its Affiliates, a non-exclusive, non-transferable, non-assignable, non-sublicensable license to utilize Other Related IP In The Jackson Patent Portfolio on or in connection with Licensee spinal implants in the Territories.  Notwithstanding the license granted herein, Jackson at all times retains for itself all rights to the Other Related IP In The Jackson Patent Portfolio, as well as Jackson's Intellectual Property Rights in the technologies shown in **TABLE D**.

6

3.03 **Term Of License.** Unless otherwise provided herein, the term of the license granted herein shall commence on the Effective Date of this Agreement and shall continue until the last of the Jackson Patents expire or are held invalid.

3.04 **No Challenge**. Licensee and its Affiliates agree not to challenge, contest or dispute the term, validity, patentability, or enforceability of any claim of the Jackson Patents or patents that may issue from applications claiming priority from the applications for those patents, including all continuations, continuations-in-part, and divisionals thereof, in any context or forum, including but not limited to any proceedings before the United States Patent and Trademark Office, including but not limited to inter partes review and re-examination proceedings, or in any court or before any government authority, including but not limited to, initiating a declaratory judgment action with respect to the Patent(s), and not to assist or support any third party in any such challenge, contest or dispute. Further, Licensee and its Affiliates agree not to oppose or try to affect the prosecution of any of the Jackson Patents during the term of this Agreement, or thereafter.

3.05 **Improvements**. The parties acknowledge and agree that, unless otherwise provided herein, Improvements to the Enabling Device Technologies made or developed by Jackson that are disclosed to Licensee pursuant to this Agreement shall be deemed to be included in the grant of the license made in Section 3.01 of this Agreement.

3.06 **No Other Rights.** Nothing contained in this Agreement shall be construed as conferring by implication, estoppel or otherwise upon either party hereto any license or other right except the license and rights expressly granted hereunder. All rights not expressly granted by a party herein are reserved to such party.

**Article IV.**

**ROYALTY RATES AND PAYMENTS**

4.01 **Royalty Rates.** In consideration for the license granted herein, Licensee shall pay or cause to be paid to Jackson a royalty at the rates set forth in **TABLE B** to this Agreement for all Gross Sales of Products incorporating one of more Enabling Device Technologies under Schedules 1-11 to **TABLE A** sold by or on behalf of Licensee or its Affiliates in the Territories during the term of this Agreement. The royalty rate for Gross Sales of Products incorporating

multiple technologies covered by claims of the Jackson Patents shall be capped at ___% and be reduced by a payment of $_____ to ___% going forward for that Product and all related Products and Product line extensions incorporating the claimed technologies. Notwithstanding the foregoing, Licensee shall pay or cause to be paid to Jackson a 2% royalty for all Gross Sales of Instruments sold by or on behalf of Licensee or its Affiliates, and the royalty rate on such sales of Instruments shall not be capped.

4.02 **Payments.** Payments of the royalties shall be made to Jackson, at 4706 W. 86th Street, Prairie Village, KS 66207, or by wire transfer (instructions to be provided). All payments shall be remitted within thirty (30) days from the last day of each calendar quarter for the royalties accruing from the Gross Sales during each such calendar quarter. Jackson reserves the right to revise the names and addresses of payees, and the allocation of royalty payments, including the designation of payees for royalties upon prior written notice to Licensee. Royalty payments shall be paid to Jackson, or Jackson's designated payee, in United States dollars. If the currency conversion shall be required in connection with the payments of royalties or other amounts hereunder, the conversion shall be made by using the exchange rate set forth in the Wall Street Journal on the last business day of the reporting period to which such royalty payments relate. Compound interest at a rate of the lesser of one percent (1%) per month or the maximum rate allowed by law shall accrue on any amount payable pursuant to this Agreement from and after the date upon which the payment is due and until the date of receipt of payment.

4.03 **Royalty Reports And Statements.** Each royalty payment shall be accompanied by an Excel Spreadsheet statement, in a format that Jackson and/or his designee can organized for review purposes, setting forth the amount and detail of the sales (whether by Licensee or an Affiliate) of each Product, Instrument, and Related System Component, identified by SKU with a description thereof, on a country by country basis, showing Gross Sales, each permitted deduction from Gross Sales and the corresponding application of the appropriate royalty rate for domestic and foreign sales and the calculation of the royalty payment for each SKU. Licensee shall also set forth the amount and detail of sales or transfer of each Product, Instrument, and Related System Component, identified by SKU with a description thereof, to any Affiliate, as well as to any distributor, or to any non-affiliate located in a non-U.S./foreign market.

4.04  **Additional Royalty Provisions.** Licensee acknowledges and understands that this Agreement requires Licensee to pay royalties on Gross Sales on Products and Instruments sold in foreign countries in which Jackson may not have an applicable Valid Patent Claim, so long as there is a U.S. Valid Patent Claim applicable to such Products or Instruments incorporating one or more Enabling Device Technologies.  Licensee agrees that such royalty payments are supported by the "know-how" provided by Jackson.  Licensee and its Affiliates hereby agree not to contest the validity of these royalty payment obligations that may not be supported by a Valid Patent Claim in foreign countries. The royalty rate for such foreign Gross Sales not supported by a Valid Patent Claim shall be fifty percent (50%) of that for the U.S. Product shown in **TABLE B**, as agreed to therein.

**Article V.**

**<u>TRADEMARKS AND MARKING</u>**

5.01  **Trademarks.** Licensee and its Affiliates may use any trademarks on Products offered for sale, sold, or distributed by or on behalf of Licensee or its Affiliates in the Territories, in the manner determined solely by Licensee and in accordance with applicable law. Notwithstanding the foregoing, Licensee and its Affiliates may not use any trademark that refers to Jackson or indicates Jackson as the source of the Product without Jackson's prior written consent.

5.02  **Marking.**  Licensee shall mark or have marked, in a form as provided under 35 U.S.C. § 287, all Products manufactured, offered for sale, sold or distributed, or imported by or on behalf of Licensee or its Affiliates with the number(s) of the Jackson Patent(s) covering the Products, their technologies, methodologies or features. Where "virtual marking" is employed, Licensee shall inform Jackson of the URL of the website that lists the relevant patent(s) for the Products.  All advertising, offers to sell and other printed material relating to the Products shall be marked with the associated "Patent Number(s)" or "Pat. Number(s)."  Licensee's failure to mark shall be deemed a material breach of this Agreement.  Jackson may notify Licensee on a semi-annual basis of changes in the status of Licensed Patents (e.g., patent issuance, abandonment, expiration) and Licensee shall update all patent markings for all new (non-inventory) products offered, manufactured or distributed to reflect the patent status changes within three (3) months

9

thereafter. Notwithstanding its obligation to mark, Licensee will take under advisement when Jackson or his representatives ask that certain patents be added or deleted from the marking list.

**Article VI.**

**<u>WARRANTIES, INDEMNIFICATION AND INSURANCE</u>**

6.01 **Licensee's Warranties.** Licensee represents and warrants that it has the authority to enter into and perform its obligations under this Agreement.

6.02 **Jackson's Warranties.** Jackson represents and warrants that it has the authority to enter into and perform its obligations under this Agreement, including to grant the license granted herein; however, Jackson does not represent or warrant that the Jackson Patents cannot be challenged or contested by third parties, and Jackson shall have no liability relating to or arising from any such challenge or contest.

6.03 **Warranty Disclaimer.** EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN, EACH PARTY MAKES NO WARRANTIES OF ANY KIND WHATEVER, EXPRESS OR IMPLIED; AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED BY EACH PARTY AND EXCLUDED FROM THIS AGREEMENT. Furthermore, each party makes no further warranty or representation respecting the safety, use, usefulness or effect of the Products licensed pursuant to this Agreement or manufactured, sold or distributed by Licensee or its Affiliates, Jackson, or a third party pursuant to this Agreement.

6.04 **Indemnification.** Licensee hereby releases and agrees to save, defend, indemnify and hold Jackson and his employees and associates harmless for and in respect of all actions, suits, claims, liabilities, losses, damages and expenses (including reasonable attorneys' and experts' fees, and expenses) of any kind or character (collectively, "Damages") resulting from or related to the design, manufacture, use, storage or application of Products, including (without limitation) injuries to persons arising from claims which may be asserted in respect of any Products manufactured, used, sold or otherwise disposed of by Licensee or its Affiliates or Licensee breach of its warranties provided for herein. The foregoing indemnification obligation shall not apply to any

Damages resulting from the infringement of third party intellectual property rights by the Enabling Device Technologies in this Agreement.

6.05  **Insurance.**  Licensee shall, for the full term of this Agreement, and at its sole expense, add Jackson to its product liability insurance as an additional insured and shall not revoke such insurance arrangement without prior written consent of Jackson, such consent not to be unreasonably denied. On request, Licensee shall provide proof of insurance to Jackson.

## Article VII.

## <u>TERM AND TERMINATION</u>

7.01  **Term.**  Except as provided in this Agreement, the term of this Agreement shall commence on the Effective Date and shall continue for so long as Licensee sells Products; provided, however, Licensee may terminate this Agreement at any time on ninety (90) days prior written notice to Jackson for any or no reason.

7.02  **Termination For Material Breach Or Bankruptcy.**  Either party hereto may terminate this Agreement upon the material breach of any of the material terms hereof by the other party on sixty (60) days prior written notice; provided, however, that if, during the said sixty (60) days, the party notified of its breach cures said breach, then the Agreement shall continue in full force and effect; and, provided further, should either party hereto be dissolved or liquidated or become insolvent or if any proceeding is filed or commenced by or against either party under the Federal Bankruptcy or any State insolvency or debtor relief law, which proceeding remains undismissed for sixty (60) days, the other party may terminate this Agreement immediately by giving written notice of such termination to the other party.  Notwithstanding the foregoing, Jackson may, but shall not be obligated to, terminate this Agreement if Licensee has more than three (3) breaches, even if it cures each breach.  Termination upon breach shall be without prejudice to any remedy either party may have against the other for the breach.  In the event this Agreement is terminated by Jackson pursuant to this Section 7.02 due to (i) an uncured material breach by Licensee or (ii) the dissolution, liquidation, insolvency of bankruptcy of Licensee, the License granted in this Agreement shall terminate with the termination of this Agreement.

7.03　**Inventory.**　Upon termination of this Agreement, Licensee and its Affiliates shall immediately cease making or importing Products and Instruments and shall have a period of one (1) year to sell all existing inventory.　All such sales of Products or Instruments, as well as Related System Components, shall continue to be subject to the royalty payment, reporting obligations, and audit provisions contained in this Agreement.

7.04　**Survival Of Provisions.**　The provisions contained in Article 1 (Definitions), Article II (Ownership), Section 3.04 (No Challenge), 3.06 (No Other Rights), Article IV (Royalty Rates and Payments), Article V (Trademarks and Marking), Section 7.03 (Inventory), Article X (Confidentiality), Article (VI) Warranties, Indemnification and Insurance), Article IX (Limits on Liability), Article XI (Audits, Accounting and Jackson Rights), Article XIV (Notice), Article XV (Entire Agreement), Article XVI (Severability), Article XVII (Covenant Not to Sue-Terms and Conditions), Article XVIII (Choice of Law, Dispute Resolution Agreement), Article XIX (General Terms and Conditions) shall survive the expiration or termination of this Agreement, along with any other provisions that by their terms expressly survive.

**Article VIII.**

**<u>INFRINGEMENTS</u>**

8.01　**Notice Of Infringement Claims**.　Each party agrees to notify the other in writing of any acts of infringement or claim of infringement by a third party involving a party's Intellectual Property Rights granted hereunder for the Products and Improvements promptly after such matters are brought to the attention of the party giving such notice or it has knowledge hereof, but within no later than sixty (60) days.

8.02　**Enforcement And Defense Of Intellectual Property Rights.** Jackson may, but shall not be obligated to, take actions as he may in his sole discretion deem appropriate, to enforce Jackson's Intellectual Property Rights, including in the Jackson Patents, and to defend any claims that the Jackson Intellectual Property Rights, including the Jackson Patents, infringe on the Intellectual Property Rights of any third party. Licensee shall provide commercially reasonable assistance to Jackson in the enforcement of any such action and/or in the defense of any such claim.

**Article IX.**

**<u>LIMITS ON LIABILITY</u>**

9.01 **Limitation Of Jackson's Liability**. IT IS UNDERSTOOD AND AGREED THAT JACKSON'S LIABILITY TO LICENSEE, WHETHER IN CONTRACT, IN TORT, UNDER ANY WARRANTY, IN NEGLIGENCE OR OTHERWISE SHALL NOT EXCEED FIFTY PERCENT (50%) OF THE AMOUNT OF THE ROYALTIES PAID PURSUANT TO ARTICLE IV OF THIS AGREEMENT DURING THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE DATE ANY SUCH CLAIM AROSE, AND UNDER NO CIRCUMSTANCES SHALL JACKSON BE LIABLE FOR SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES. THIS LIMITATION OF LIABILITY IS COMPLETE AND EXCLUSIVE, SHALL APPLY EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH POTENTIAL CLAIMS, LOSSES, OR DAMAGES AND SHALL APPLY REGARDLESS OF THE SUCCESS OR EFFECTIVENESS OF ANY OTHER REMEDIES POSSESSED BY A PARTY HERETO OR ANY THIRD PARTIES. THIS LIMITATION OF LIABILITY REFLECTS AN AGREED ALLOCATION OF RISK BETWEEN THE PARTIES HERETO IN VIEW OF THE NATURE OF THIS TRANSACTION. THE LIMITATION OF LIABILITY SHALL APPLY DESPITE ANY FAILURE OF ESSENTIAL PURPOSE.

**Article X.**

**<u>CONFIDENTIALITY</u>**

10.01 **Protection.** Both parties agree to: (a) hold all Confidential Information in strict confidence and to take reasonable precautions to protect such Confidential Information from disclosure, including, without limitation, all precautions each party employs to protect its own confidential information; (b) not make any use of or divulge any such Confidential Information or any information derived therefrom to any third person, except as provided for herein or permitted by express written agreement between the parties; (c) not derive any direct or indirect commercial benefit therefrom, except as provided for herein or permitted by express written agreement

13

between the parties; and (d) not copy or reverse engineer any such Confidential Information of the other party, unless otherwise provided for or permitted by this Agreement.

10.02 **Confidential Information.** The parties acknowledge that terms of this Agreement and any oral or written information exchanged between the parties regarding such terms are regarded as Confidential Information. Each Party shall maintain confidentiality of all such Confidential Information, and without obtaining the written consent of the other party, shall not disclose such Confidential Information to any third parties, except: (a) to the extent information is in the public domain (other than through the receiving party's unauthorized disclosure); (b) if required by any applicable laws or regulations, rules of any stock exchange, or orders of a court or other government authority; (c) to Jackson's representatives to effectuate Jackson's right to conduct audits and obtain accountings, as provided in Article XI; or (d) to shareholders, actual or prospective investors or acquirers, legal counsel, or financial advisors of the parties, to the extent each recipient has a need to know such information, provided that such representatives, shareholders, investors or acquirers, counsel or advisors shall be bound by the confidentiality obligations set forth in this Section.

10.03 **Expiration.** Upon expiration or termination of this Agreement, as the case may be, the provisions of this Article X shall continue for a period of five (5) years from the date of such expiration or for a period of ten (10) years from the date of such termination. Upon expiration or termination of this Agreement, each party shall return to the other party any and all documents containing Confidential Information supplied or transferred to such party by the other party during the term of this Agreement.

**Article XI.**

**<u>AUDITS, ACCOUNTING AND JACKSON RIGHTS</u>**

11.01 **Books and Records.** Licensee shall keep complete and accurate books and records in accordance with generally accepted accounting principles relating to its compliance with the terms of this Agreement, including for the sales, payments and calculations provided for under this Article XI (Audits, Accounting and Jackson Rights) and Article IV (Royalty Rates And Payments), including records sufficient to show compliance regarding Affiliate sales to Unrelated Third

14

Parties.  Licensee shall also keep complete and accurate books and records in accordance with generally accepted accounting principles showing inventory of Licensee and Affiliate Inventory and the ultimate disposition of any Product, Instrument, or Related System Component in Licensee's inventory and in Affiliate Inventory (whether sold, returned, or scrapped, and the date of such ultimate disposition). All books and records shall be kept current and shall be retained by Licensee for at least five (5) years following the termination of this Agreement.

11.02  **Jackson's Right To Audit And Receive Samples.**  Upon thirty (30) days written notice, Jackson shall have the right, exercisable not more than once every twelve (12) months, to appoint one or more representatives to examine the books, records and accounts of Licensee and its Affiliates during reasonable business hours to verify royalty payments and calculations and that all Products, Instruments, and Related System Components are accounted for under this Agreement.  Jackson may audit Licensee more than once every twelve (12) months if there has been a previous audit and a discrepancy of payment or calculation of sales has been found and presented to Licensee in writing.  If there is a dispute raised by Jackson or his representatives as to whether a product sold by or on behalf of Licensee or Affiliates should be covered by this Agreement, Jackson and/or his representatives may ask and Licensee shall within thirty (30) days of such request provide Jackson with at least four (4) samples of each such accused product (as well as with each Related System Component, as may also be requested) for examination, such samples to be treated as Confidential Information under this Agreement.  In the event any audit or examination discloses an underpayment of royalties, Licensee shall promptly pay Jackson such underpayment and, if the amount of such underpayment is five percent (5%) or more of the amount that was due for any calendar quarter, Licensee shall pay or reimburse Jackson for the cost of such audit. Any audit will be conducted in a timely manner by an accredited accounting firm approved by Licensee and under a confidentially agreement between the Licensee and the accounting firm, and all requested records, materials, and information will be provided by Licensee within forty-five (45) days of such request(s), and there shall be no limitations on where the audits occur, including multiple on-site visits as the firm may need.  Jackson shall have the right to examine the books, records and accounts of Licensee and its Affiliates for five (5) years following the termination of this Agreement.

11.03 **Inventory Discrepancies.** Any inventory shortages found in any audit and unaccounted for will be added to Gross Sales for late royalty payment with compound interest.

## Article XII.

## SUCCESSION AND ASSIGNMENT

12.01 Licensee may not assign this Agreement without the written consent of Jackson; provided, however, without such consent Licensee may assign this Agreement in connection with the transfer or sale of all or substantially all its assets or business to, or its merger or consolidation with another company.

12.02 Jackson may not assign this Agreement without the written consent of Licensee (such consent not to be unreasonably denied); provided, however, without such consent Jackson may assign certain ownership rights in the Jackson Patents, and the corresponding rights to receive royalty payments under this Agreement, to other persons, including an offshore entity in connection with the sale of Products outside of the United States.

12.03 This Agreement shall inure to the benefit of and be binding upon each party signatory hereto, its heirs, successors, third party beneficiaries and permitted assigns. No assignment shall relieve either party of the performance of any accrued obligation which such party may then have under this Agreement.

## Article XIII.

## EXECUTION OF ADDITIONAL DOCUMENTS

13.01 Each party hereto agrees to execute such further papers or documents, or agreements as may be necessary or desirable to effectuate the purposes of this Agreement and carry out its provisions.

## Article XIV.

## NOTICE

16

14.01   Unless the parties hereto otherwise provide, any notice or reporting required to be given under this Agreement shall be in writing and shall be deemed to have been duly given if sent by hand or overnight courier service, registered or certified mail or by cable, telex or facsimile, addressed as follows:

If to Jackson:

Roger P. Jackson, M.D.
4706 West 86th Street
Prairie Village, Kansas 66207

Thomas Gemmell, Esq.
Polsinelli PC
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606

If to Licensee:

ChoiceSpine

_____
_____
Attention: President

or at any other address designated by either party in a notice given to the other party pursuant to the provisions of this Article XIV.  Any notice that is required to be given within a stated period shall be deemed timely if mailed before midnight of the last day of such period and if received by the addressee within a reasonable time thereafter.  If any notice is sent by registered or certified airmail, the date and time of the postmark, stamped on the envelope in which notice is mailed shall be deemed to be the date and time of delivery of such notice.

## Article XV.

## ENTIRE AGREEMENT

15.01   This Agreement constitutes the entire Agreement between the parties respecting the terms contained herein and supersedes all prior written or oral agreements or understandings in variation of its terms.  No variation or modification of the terms of this Agreement, nor any waiver of any of the terms or provision hereof, shall be deemed valid unless in writing and signed by the parties signatory hereto.

## Article XVI.

## SEVERABILITY

16.01   If any provision of this Agreement should be or become fully or partly invalid or unenforceable for any reason whatsoever or violate any applicable law, this Agreement is to be considered devisable as to such provision, and such provision is to be deleted from this Agreement, and the remainder of this Agreement shall be deemed valid and binding as if such provision were not included herein.  The parties agree to replace such invalidated or unenforceable provision by a valid and enforceable provision, which, as far as legally possible, shall carry out the purposes of this Agreement.

## Article XVII.

## <u>COVENANT NOT TO SUE-TERMS AND CONDITIONS</u>

17.01   Jackson hereby forever releases and agrees not to sue Licensee for sales of any and all products prior to the Effective Date of this Agreement for an agreed upon payment of $_____ to be paid to Jackson within five (5) business days of the signing of this Agreement. The covenant not to sue is complete and irrevocable.

17.02   Jackson agrees not to sue Licensee for sales of any and all accused products or licensed Products after the Effective Date of this Agreement for an agreed upon payment of $_____ to be paid to Jackson within five (5) business days of the signing of this Agreement and in lieu of the alternative dispute resolution provision under Article XVIII.

## Article XVIII.

## <u>CHOICE OF LAW, DISPUTE RESOLUTION AGREEMENT</u>

18.01   This Agreement shall be subject to, governed by, and construed according to the laws of the State of Missouri without regard to its conflict of laws provisions.  Any dispute that arises under this Agreement after Effective Date shall be resolved amicably between the parties. If a dispute should exist and not be resolved amicably within ninety (90) days of written notice, it may be referred by either party unilaterally to alternative dispute resolution (ADR, **TABLE E**), which shall be conducted in Kansas City, Missouri, by an experienced neutral who shall be familiar with the form of dispute and apply the laws of the State of Missouri.  ADR shall be conducted according to the rules of the CPR Institute for Dispute Resolution (CPR), as provided in **TABLE**

18

**E** to this Agreement. The neutral shall have the discretion to award reasonable attorneys' and experts' fees and costs to the prevailing party. Nothing in this Article, or elsewhere in this Agreement, affects Jackson's audit rights or ability to ask for and receive an accounting under Article XI of this Agreement, and Jackson shall continue to have the right to access Licensee's books and records to verifying payments and calculations and Licensee shall cooperate with Jackson's exercise of its audit and accounting rights notwithstanding any dispute between the parties relating to this Agreement. Further, nothing in this Article, or elsewhere in this Agreement, affects Jackson's right to bring an action to compel Licensee's cooperation in any such audit or accounting, and Jackson shall continue to have such right, regardless of any dispute(s), including those that may be submitted to ADR. Further, neither this Article nor the process provided for ADR under **TABLE E** can be used by Licensee to prevent, stop, or delay such audit or accounting.

18.02   In an effort to avoid future disputes as to whether a product of Licensee is a Product licensed under the Jackson Patents, Licensee shall, at a minimum of forty-five (45) days  in advance of any commercial manufacture, use, marketing, offer for sale or sale, inform and provide to Jackson, if requested, any new spinal fixation product or purported design-around product, including components incorporated therein, which Jackson or his representatives will, in good faith, review under confidentiality to determine if the product or component is covered by claims of any of the Jackson Patents. Jackson agrees to inform Licensee of the results of its review, including any claims of violation of any patents licensed hereunder, in writing, within forty-five (45) days of Jackson's receipt of the new product or purported design-around product. Jackson further agrees to maintain all information Licensee provides to Jackson regarding such new product or purported design-around products as confidential and not to disclose such information to any party outside of this Agreement, other than as may be directed by a court.

### Article XIX.

### GENERAL TERMS AND CONDITIONS

19.01  It is expressly agreed by the parties hereto that Jackson and Licensee are independent contractors and nothing in this Agreement is intended to create an employer relationship, joint venture, or partnership between the parties. No party has the authority to bind the other. This Agreement may be executed in any number of counterparts, each of which shall

19

be deemed an original as against the party whose signature appears thereon, but all of which taken together shall constitute but one and the same instrument. The failure of either party to assert a right to which it is entitled or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the other party. The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement. The titles and subtitles used in this Agreement are used for convenience only and are not considered in construing or interpreting this Agreement. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent and no rules of strict construction will be applied against any party.

IN WITNESS WHEREOF, the parties have caused this Agreement through their duly-appointed and authorized officers and representatives to be executed in duplicate effective as of the Effective Date.

AGREED BY:                                      AGREED BY:

CHOICESPINE                                     ROGER P. JACKSON, M.D.

By:_____                        By:_____
Name:_____                            Roger P. Jackson, M.D., Individually
Title:_____

20

**TABLE A**

**Jackson Patents\***

\* Includes patents claiming priority thereto, including any continuations, patent applications, substitutions, amendments, extensions, reexaminations, divisionals, renewals, confirmations, revalidations, reissues, and foreign counterparts thereto for the Enabling Device Technologies outlined in the following separate Schedule 1 through Schedule 11 attachments to TABLE A claimed in the listed patents on each Schedule; and wherein the license for the claimed Enabling Device Technologies is intended to cover similar component embodiments having equivalent functionalities for the representative example components and/or assemblies shown on each schedule:

21

**TABLE B**

**Royalty Rates\***

\* Royalty rates on Gross Sales (less returns) on implant systems to practice the Enabling Device Technologies, with a capped __% royalty when multiple licensed technologies are incorporated within the same Product.

Notwithstanding the foregoing, the royalty rate for all Gross Sales of Instruments is 2%, and is not capped.

The applicable royalty rate is 50% of the stated U.S. rate on Gross Sales in foreign countries where there is not a patent claim covering the Product, Instrument, or Related System Component.

Schedule 1-    1%

Schedule 2-    2%

Schedule 3-    2%

Schedule 4-    2%

Schedule 5-    3%

Schedule 6-    3%

Schedule 7-    3%

Schedule 8-    3%

Schedule 9-    3%

Schedule 10-   4%

Schedule 11-   4%

**TABLE C**

**Products\***

\* This list of Products does not include Instruments or Related System Components, which, for purposes of the calculation and payment of royalties, are also Products under this Agreement.

This list includes those products that the parties agree are or anticipate being licensed under this Agreement. Licensed products are not limited to the specific name(s) listed in this Table and also include all product line extensions thereof and amendments or alterations thereto that are covered by a claim of the Jackson Patents.

This list may be amended from time to time to include new products and/or new product names but such new products or new product names remove neither the license granted nor Licensee's obligations under this Agreement, including to pay royalties on sales thereof.

23

**TABLE D**

**Exclusively Licensed And Assigned Patents\***

\* This list is for Enabling Device Technologies in patents (a) exclusively licensed to others or (b) assigned to others:

    (a)    <u>Exclusive license</u> for-

        (i)    polyaxial bone screw with spline capture connection and separate articulating retaining structure:

            6,716,214

            8,377,102

        (ii)    polyaxial bone screw with separate pre-loaded pop-on non-pivoting open ring retaining structure:

            8,556,938

            9,504,496

            10,765,456

        (iii)    polyaxial bone screw with two discrete pre-loaded pivoting retainers:

            7,625,396

            7,875,065

    (b)    <u>Assigned patents</u> for-

        (i)    polyaxial bone screw with separate compound articulating retaining structure:

            7,476,239

            10,076,361

10,194,951

10,231,757

RE47,551E

(ii)    specific MIS attachable-detachable tools:

| | |
|---|---|
| 7,160,300 | 9,216,039 |
| 7,470,279 | 9,265,534 |
| 7,862,587 | 9,265,535 |
| 8,066,739 | 9,265,536 |
| 8,100,915 | 9,265,537 |
| 8,152,810 | 9,271,767 |
| 8,162,948 | 9,532,815 |
| 8,273,089 | 9,585,701 |
| 8,292,892 | 9,629,669 |
| 8,377,067 | 9,636,151 |
| 8,894,657 | 9,662,151 |
| 9,050,139 | 9,788,868 |
| 9,050,148 | 9,918,751 |
| 9,055,978 | 9,987,054 |
| 9,101,415 | 10,485,588 |
| 9,173,682 | 10,507,047 |
| 9,211,150 | |

**TABLE E**

**Alternative Dispute Resolution**

The parties recognize that bona fide disputes as to certain matters may arise from time to time during the term of this Agreement which relate to a party's rights and/or obligations. To have such a dispute resolved by this Alternative Dispute Resolution ("ADR") provision (as is required by this Agreement) the following procedures must be followed:

A party first must send written notice of the dispute to the other party for attempted resolution by good faith negotiations between the respective presidents (or their designees) of the affected subsidiaries, divisions, or business units (all references to "days" in this ADR provision are to calendar days).

If the matter has not been resolved within ninety (90) days of receipt of the notice of dispute, either party may initiate an ADR proceeding as provided herein. The parties shall have the right to be represented by counsel in such a proceeding.

1.      To begin an ADR proceeding, a party shall provide written notice to the other party of the issues to be resolved by ADR. Within fourteen (14) days after its receipt of such notice, the other party may, by written notice to the party initiating the ADR, add additional issues to be resolved within the same ADR.

2.      Within twenty-one (21) days following receipt of the original ADR notice, the parties shall select a mutually acceptable neutral individual (a "neutral") to preside in the resolution of any disputes in this ADR proceeding. If the parties are unable to agree on a mutually acceptable neutral within such period, either party may request the President of the CPR Institute for Dispute Resolution (the "CPR"), 366 Madison Avenue, 14th Floor, New York, New York 10017, to select a neutral pursuant to the following procedures:

        (a)      The CPR shall submit to the parties a list of not less than five (5) candidates within fourteen (14) days after receipt of the request, along with a *Curriculum Vitae* for each candidate. No candidate shall be an employee, director, or shareholder of either party or any of their subsidiaries or Affiliates.

26

(b)     Such list shall include a statement of disclosure by each candidate of any circumstances likely to affect his or her impartiality.

(c)     Each party shall number the candidates in order of preference (with the number one (1) signifying the greatest preference) and shall deliver the list to the CPR within seven (7) days following receipt of the list of candidates. If a party believes a conflict of interest exists regarding any of the candidates, that party shall provide a written explanation of the conflict to the CPR along with its list showing its order of preference for the candidates.  Any party failing to return a list of preferences on time shall be deemed to have no order of preference.

(d)     If the parties collectively have identified fewer than three (3) candidates deemed to have conflicts, the CPR immediately shall designate as the neutral the candidate for whom the parties collectively have indicated the greatest preference.  If a tie should result between two candidates, the CPR may designate either candidate.  If the parties collectively have identified three (3) or more candidates deemed to have conflicts, the CPR shall review the explanations regarding conflicts and, in its sole discretion, may either (i) immediately designate as the neutral the candidate for whom the parties collectively have indicated the greatest preference, or (ii) issue a new list of not less than five (5) candidates, in which case the procedures set forth in subparagraphs 2(a) - 2(d) shall be repeated.

3.     No earlier than twenty-eight (28) days or later than fifty-six (56) days after selection of the neutral, the neutral shall hold a hearing to resolve each of the issues identified by the parties.  The ADR proceeding shall take place at a location agreed upon by the parties.  If the parties cannot agree, the neutral shall designate a location other than the principal place of business of either party or any of their subsidiaries or affiliates.

4.     At least seven (7) days prior to the hearing, each party shall submit the following to the other party and the neutral:

(a)     a copy of all exhibits on which such party intends to rely in any oral or written presentation to the neutral;

27

(b)     a list of any witnesses such party intends to call at the hearing, and a short summary of the anticipated testimony of each witness;

(c)     a proposed ruling on each issue to be resolved, together with a request for a specific damage award or other remedy for each issue. The proposed rulings and remedies shall not contain any recitation of the facts or any legal arguments and shall not exceed one (1) page per issue.

(d)     a brief in support of such party's proposed rulings and remedies, provided that the brief shall not exceed twenty (20) pages.  This page limitation shall apply regardless of the number of issues raised in the ADR proceeding.

Except as expressly set forth in subparagraphs 4(a) - 4(d), or as may otherwise be agreed to be the parties and authorized by the neutral, no discovery shall be required or permitted by any means, including depositions, interrogatories, requests for admissions, or production of documents.

5.     The hearing shall be conducted for no more than two (2) consecutive days and shall be governed by the following rules:

(a)     Each party shall be entitled to five (5) hours of hearing time to present its case.  The neutral shall determine whether each party has had the five (5) hours to which it is entitled.

(b)     Each party shall be entitled, but not required, to make an opening statement, to present regular and rebuttal testimony, documents or other evidence, to cross-examine witnesses, and to make a closing argument.  Cross-examination of witnesses shall occur immediately after their direct testimony, and cross-examination time shall be charged against the party conducting the cross-examination.

(c)     The party initiating the ADR shall begin the hearing and, if it chooses to make an opening statement, shall address not only issues it raised but also any issues raised by the responding party.  The responding party, if it chooses to make an opening statement, also shall address all issues raised in the ADR.  Thereafter, the presentation of regular and

28

rebuttal testimony and documents, other evidence, and closing arguments shall proceed in the same sequence.

        (d)     Except when testifying, witnesses shall be excluded from the hearing until closing arguments.

        (e)     Settlement negotiations, including any statements made therein, shall not be admissible under any circumstances.  Affidavits prepared for purposes of the ADR hearing also shall not be admissible.  As to all other matters, the neutral shall have sole discretion regarding the admissibility of any evidence.

6.     Within seven (7) days following completion of the hearing, each party may submit to the other party and the neutral a post-hearing brief in support of its proposed rulings and remedies, provided that such brief shall not contain or discuss any new evidence and shall not exceed ten (10) pages.  This page limitation shall apply regardless of the number of issues raised in the ADR proceeding.

7.     The neutral shall rule on each disputed issue within fourteen (14) days following completion of the hearing.  Such ruling shall adopt in its entirety the proposed ruling and remedy of one of the parties on each disputed issue but may adopt one party's proposed rulings and remedies on some issues and the other party's proposed rulings and remedies on other issues.  The neutral shall not issue any written opinion or otherwise explain the basis of the ruling.

8.     The neutral shall be paid a reasonable fee plus expenses.  These fees and expenses, along with the reasonable legal fees and expenses of the prevailing party (including all expert witness fees and expenses), the fees and expenses of a court reporter, and any expenses for a hearing room, shall be paid as follows:

        (a)     If the neutral rules in favor of one party on all disputed issues in the ADR, the losing party shall pay one-hundred percent (100%) of such fees and expenses.

        (b)     If the neutral rules in favor of one party on some issues and the other party on other issues, the neutral shall issue with the rulings a written determination as to how

29

such fees and expenses shall be allocated between the parties. The neutral shall allocate fees and expenses in a way that bears a reasonable relationship to the outcome of the ADR, with the party prevailing on more issues, or on issues of greater value or gravity, recovering a relatively larger share of its legal fees and expenses.

9. The rulings of the neutral and the allocation of fees and expenses shall be binding, non-reviewable, and non-appealable, and may be entered as a final judgment in any court having jurisdiction.

10. Except as provided in paragraph 9 or as required by law, the existence of the dispute, any settlement negotiations, the ADR hearing, any submissions (including exhibits, testimony, proposed rulings, and briefs), and the rulings shall be deemed Confidential Information subject to the confidentiality provision under Article X to this Agreement. The neutral shall have the authority to impose sanctions for unauthorized disclosure of Confidential Information.

11. All disputes referred to ADR, the statute of limitations, and the remedies for any wrong that may be found, shall be governed by the laws of the **State of Delaware**.

12. The neutral may not award punitive damages. The parties hereby waive the right to punitive damages.

13. The hearings shall be conducted in the English language.